Good morning, Your Honors. My name is Matt Bellinger with Kenobi Martin's Olsen & Behr on behalf of the Pellant Monster Energy Company, and I would like to reserve three minutes for rebuttal, please. May it please the Court, in this trademark and trade dress infringement case, we are of confusion. The District Court committed multiple errors, each requiring reversal. The District Court committed legal error. It also did not view the evidence in the light most favorable to Monster, including with respect to Monster's unrebutted survey evidence, which showed actual confusion among consumers in which itself necessitates reversal. I'll start by addressing the first likelihood of confusion factor the District Court considered, which is the strength of Monster's marks. The District Court erred in assessing the strength of Monster's asserted marks, and that error then cascaded through its analysis of other likelihood of confusion factors, including similarity of the marks and relatedness to the party's goods. The strength of a mark is evaluated based both on its conceptual strength and its commercial strength. With respect to conceptual strength, the District Court found that Monster's marks are arbitrary, at least for energy drinks, and arbitrary marks are entitled to the highest degree of  With respect to commercial strength, the District Court Do the, only the four Monster products with the Pantone 375C kind of fluorescent green color, are those the only ones that really confuse consumers? No. The, all of the four Monster products are accused of infringement to bear the marks. With respect to the trade dress claim, Monster defined its trade dress as the word monster in combination with the colors green and black. Well, I guess, I guess the question is that four Monster sells in many, many different colors. Their mark has the four-headed monster, doesn't have the sort of the claw, that monster energy does. I, what if there's just not a lot of similarity other than the Pantone 375C green with black combination and the word monster? We believe that our survey evidence, which, in which a four Monster towel product, which was identified as their best-selling product, was surveyed. That survey evidence was unrebutted and showed a very high 64% level of association. It was 60.4. I think cumulatively it was about 64% once all the unduplicated answers were considered, but in any event, that was a very high level of confusion, and Monster's expert opined that that's applicable to four Monsters. How many, but that same survey said only 5.8% believe there was a business connection between Monster and the maker of the towel. Sure, so the way that these surveys are done, there's a series of questions that are asked. There's a question about, you know, who do you think makes or puts out this product, and then there's some follow-up questions that are designed to test other factors that might be relevant to assessing confusion, such as association as to source, and so at the end, the expert tallies the results from each of those questions, and to the extent that a respondent answered, you know, in response to two questions in a way that may show confusion, those responses are then deduplicated so that only, you know, each survey respondent only counts essentially as one vote, and so once those responses were deduplicated across the survey, that's how you arrive at the 64% total number of survey participants who are confused. Right, but the lower, I mean, it was an 8.7% believed that the maker of the towel also put out energy drinks. That's, again, a very much lower percent than the 64% you're quoting. Correct, but in response to the first question as to who makes or puts out the product, in response to that question, it was a much higher number, above 60%, and then these respondents were also asked additional questions to, again, test different elements that may be used to show confusion. And so the end result of the survey, once all of the responses were deduplicated, was the 64% confusion level, which applies to... Counsel Judge Kult, if I could ask you a question, please. Could you elaborate a little on any similarities and differences in the products that your sold by 4Monster? Yes, Judge Gould. So in addition to selling beverages under Monster's marks, Monster also sells and distributes other products, including towels, bags, clothing, and blankets, and those are the identical products that 4Monster sells. So we have an identity of the types of products that each party are offering under their respective marks. Does it matter that it seems like you give yours away when you sponsor events? Like you give the towels away, that they're not actually purchased by a consumer? No. Is that relevant? It is not relevant. But why not? Isn't the language consumer and class of purchasers, doesn't that all imply that someone has to buy it? Well, I think that goes to the commercial strength of the mark. So setting aside the issue of conceptual strength, which the district court essentially ignored in respect to Monster's non-beverage goods, with respect to commercial strength, what matters there is whether there's an association among those products with the particular source. And so here, the evidence showed that Monster had distributed at least 4.7 million of its non-beverage goods, including towels, blankets, backpacks, clothing. And so whether a consumer purchased those items or received them from free is really of no moment. What matters is that Monster's marks are on those items and that they're making their way into the hands of consumers. And this court has previously found that advertising expenditures may be used to demonstrate commercial strength. So does that mean you don't have evidence that there is a similar class of purchasers between your blankets and towels and for Monster's? No, there is evidence of that. In fact, for Monster, stated with respect to their target audience, that they essentially have no specific target market, that their target market is the general public, that they sell to anyone who's interested in purchasing the towel, bag, clothing, blankets. So their consumers necessarily subsume Monster's potential consumers for their same goods. Is there any evidence on the record that Monster sells towels to the public? Yes, there was ample evidence of that. There was evidence in the form of testimony from Monster's CEO, Mr. Sachs, that those products are sold. We produced detailed business records in the form of inventory transaction reports maintained by Monster that indicate products that were sold or distributed. Now granted, those particular reports didn't differentiate between how many were sold or how many were distributed, but it's clear from the reports that all the products were either sold... Well, because Mr. Sachs' testimony ties that together, that those products were, at least some of them were sold and some of them were given away free of charge. In addition, Monster introduced evidence of 34 license agreements for its non-beverage goods and evidence of millions of dollars in royalties received from those agreements. So that's further evidence that all these non-beverage goods, you know, have in fact been sold. I have another question. There's an eight-factor test for trademark confusion that I think Bar Circuit has applied. I want to know which of those eight factors you think raise factual issues. Yeah, so I think the first and most important factor here is the actual confusion factor. And so actual confusion may be established by survey evidence. And so here we have unrebutted survey evidence of a very high level of actual confusion. Foremonster actually sought to exclude that survey on summary judgment. The district court denied that request and said it was going to consider it. And so having made that determination, the district court was required to view that survey evidence in the light most favorable to Monster. But in fact, it effectively did the opposite. It discounted essentially any result in the survey that identified Monster as referring to a pellet. But there was ample evidence in the record from which a reasonable jury could find that those survey responses did in fact refer to us. And so I would also direct the court to its decision in Thane v. Trek Bicycle in which it relied upon survey evidence alone at a much lower rate of about 28% to reverse a grant of summary judgment. So I think this case fits squarely within the confines of that case. Is Monster trying to acquire a monopoly on anybody who tries to use the word Monster to trademark textile goods? No. No. You have to, in assessing confusion, it's not just a test of the mark alone. You have to see how the mark is actually being used in the marketplace and on which specific goods. So this would have to be done on a case-by-case basis. But here, given for Monster's use of its mark and the types of goods that it's using its marks on and the confusion evidence, there's at a minimum issues of fact that this needs to go to a jury to be decided. Let's say you put your black with whatever, the Pantone 375 green on a car. Do you now, I mean, I guess I'm just unclear on how far does this right go? I mean, you're clearly outside of energy drinks. So does this go to cars, buses? How far are you extending? Well, it goes to, I'm sorry, let me finish. It goes to the relatedness of goods. So that, again, is a question in the minds of consumers as to what's deemed related. But I don't think the court has to answer that specific question because here, the fact is the Foremonster is using its mark on identical goods that Monster's using its mark on, marks on. And Monster also has trademark. Okay, tell me, let's say Foremonster and Monster Energy both have cars that have, that are in the black color and they have the Pantone green. They have their separate marks, one with the forehead and Monster, yours with the claw. Are you saying then that you would also have a right for protection in that context of a car? Well, again, I think that would turn on whether consumers, there's an association and protectable rights in, for example, Monster's marks for those goods. And to be clear here, the district court, it was undisputed that Monster had protectable trademark rights for these goods. The district court acknowledged that up front. It wasn't even part of the district court's opinion. The only thing the district court addressed was the likelihood of confusion. But how are we going from energy drinks to cars? Well, if Monster started producing cars or licensing its mark for use on cars and entered, you know, that industry and over time built up an association, then it, you know, conceivably could claim rights in that. But again, I think that's not an issue. No, look at, you have all these promotional events, right? You have a promotional event and you decide, okay, I want to put this on a car at, I guess you had what, a photo of Tiger Woods at some PGA tournament? Let's say you want now whichever golf star to be driving up to that tournament in a black car with the Monster trademark on it.  As a promotion, not being sold. Yes. I think the difference between- Then you would be asking for that protection to extend to cars. Sure. Like Monster, you know, sponsors or has briefly sponsored NASCAR race cars. It sponsors Formula One teams. But in those contexts, the consumer viewing a brand on those cars understands that there's lots of different brands that advertise on those cars and consumers understand that that is an advertising use, but the source of the underlying car might be Ferrari or Mercedes. So that's a different use than what we have here, where you have the parties using their marks on identical goods and for which Monster has registrations. And I'm well into my rebuttal time, I'd be happy to answer any additional questions. Thank you. We have a minute, 28 seconds left. Good morning, Your Honor. Good morning. I want to go for Cheng Tzu Shikoga Industrial Co., Ltd. and Cheng Tzu Hege Microfiber Textile Co., Ltd. I'm shocked that opposing counsel has led with this survey. As discussed in our brief and, you know, citing recent Supreme Court precedent, surveys can be abused in the trademark context quite regularly. And in fact, what this survey did is showed participants a picture of our product with the four Monster and then they asked, what's the source of this product? A lot of the survey respondents answered Monster. And then in the underlying data, this isn't included in the expert report, but it is in the excerpts of record. If you look at the data, there's another question, why did you say Monster? And I know at least the first 20 of those responses to Monster say, because that's what it says on the town case. But isn't this error for the district court to be making these determinations? That's for a jury, right? This goes to, you're making jury arguments as to why this survey is not persuasive. And you prevailed on the district court. The district court says, the court makes clear that it is not weighing the evidence here. Rather, the court is simply concluding that the evidence is unhelpful to the likelihood of confusion analysis because Monster Energy's expert included the term Monster in his survey results. But that's actually weighing the evidence. And I don't think that's proper. On summary judgment, we're not supposed to do that. And if anything, if you're supposed to make inferences, it's in favor of the non-moving party. So are you inviting us to affirm error here on the part of the district court? No, I think there's an erroneous assumption in the question. The first step in analyzing trademark infringement is to compare the accused mark against the registered mark. There is no registered mark for Monster in this case. So a survey that counts as instances of confusion, responses that Monster is the source of a product, is just not germane to the case. It's not a jury question. It's just completely irrelevant to the marks at issue in the case. There are 25 marks in the case, 17 of them, some of which are word marks, are to Monster Energy. There's one California mark to Monster. But all the registered marks that we're comparing for Monster's mark to are logo marks with the distinctive lettering symbol design, the five symbols. The black towels. Okay, let me just ask, do you concede that for Monster's Pantone 375C green is the same as Monster Energy's trade dress? Trade dress? I don't think Monster has defined trade dress other than in the broadest and legally unavailing sense of the colors green and black appearing on a can. Or I don't even think they limit it to can. They say the color is green and black. All right, I'll just say when I looked at your blanket, the black with the Pantone 375C green, I thought it was Monster Energy's trade dress. So you want to address that? I mean, you specifically chose the black with that very, very specific fluorescent green and a Monster name. Your Honor- Tell me why that doesn't go to likelihood of confusion. The towels come in at least 12 different colors and there's one option- Let's talk about the Pantone 375C green towel. Well, that is- You chose- That is one version- Your client chose that particular green, right? Didn't choose forest green, didn't choose sea green, chose Pantone 375C green. I think this may have been discussed in the briefing below. I know it came up in a deposition where the specific color was suggested by a marketing person in China. Our clients who are in China had never seen or at least never acknowledged they did take one trip to the United States. At least that's their claim. They said they did a road trip throughout the United States going to all these convenience stores and they say they never saw it, right? Yes, and they do not speak great English. If I traveled through China, I doubt I could remember- You could see a can, right? You could see a can. That doesn't require knowledge of English, does it? Yes, but there would probably be a display of cooler- But this is summary judgment. It's just a question of genuine factual dispute, right? I'm not saying who's going to ultimately prevail if this goes to trial. This is just, is there a genuine material factual dispute? There's no evidence in the record or anywhere that 4Monster had ever seen the color combination and that specific Pantone color. Well, there's no evidence of intentional appropriation of Monster Energy's mark. The question is though, is there likelihood of consumer confusion? That's the issue. And there's not one case, despite the billions of cans of Monster Energy sold and the million towels that 4Monster has sold, there's not one example in the 20,000 reviews listed on I thought this was going to be a Monster Energy towel. But instead, it's a 4Monster towel. In the 20,000 reviews, no one says that. Of course, the fact is that this is sort of a low-cost item. I mean, people aren't buying Mercedes-Benz. They're buying, what, a $10 or $20 towel. And the law seems to be that where there's a relatively cheap product, consumers aren't particularly astute or worrying about what the source is. And that somewhat goes to another issue, although in some ways conceptually less significant with the survey, is that 99%, at least, of 4Monster sales are through its Amazon.com store page. When people see this item, it's your standard Amazon store page. That's the context in which the purchases are made. Not seeing a physical good or a case in a convenience store. What they see is a thousand words of text describing the product, the customer reviews, everything else. That's the context in which purchases are made. And even though it's a low-cost product, you need to put it in your, you need to look at it, see how many stars it's rated, put it in your Amazon shopping cart, and then do your Amazon checkout. But I think the fact that the survey presented such an artificial thing where people, people will generally not be exposed to this case until after these goods arrive at their home and say, oh, it's a 4Monster case. It's not something that would induce the purchase of the product. And, Your Honor, in terms of- Let's even talk about the survey, right? The survey said that the net fame measure for Monster Energy is 86.2%, right? So then why wouldn't it be at least an inference that should go to a jury, that if somebody says, I think this belongs to Monster, that they're probably thinking about Monster Energy? Your Honor, clarification- Why isn't that at least a jury question? Did you mention fame? Is this a different- Okay, I- Are we on to the Isakson survey? Okay, I am looking at Dr. Isakson's declaration, and I'm looking at ER 102. He says in paragraph 13, the survey database included 398 interviews. Among all respondents, 87.7% answered that they had heard of Monster Energy before. After adjusting for the control, the net fame measure for Monster Energy is 86.2%. So clearly, brand recognition for Monster Energy is high. So if they were asked, do you think this belongs to Monster Energy drinks, Monster Energy drinks, drinks, why is that not at least a jury question about- Your Honor, the Isakson survey- Our concern and the concerns that I've expressed are about the Hollander survey. I understand. The Isakson survey- But what I'm saying is the Isakson survey, in addition to the Hollander survey, I think at least presents an issue for the jury. You're saying the Hollander survey, and the district court agreed with you, is problematic because they just said Monster in the question as to confusion. Yes, but there's no Monster in the question. And what I'm saying is if you combine that with the Isakson survey, which says, wow, this Monster Energy brand has over 86% brand recognition, then why isn't that at least a jury question? The Isakson survey was only with reference to energy drinks and was done among energy drink consumers. They've sold 140 billion cans of energy drinks. I expect people to be able to recognize, you know, with the slightest indication that, you know, an energy drink is related to Monster if it has that shade of green at all. There, I think they have very strong protection and wide recognition and $10 billion in advertising. But that is, you know, they're using that to try to bootstrap an argument that there's infringement of these specific marks that contain the symbols and the stylized designs. They're taking their broad energy drink marks and their fame in the energy drink mark and trying to squash people in completely unrelated fields. And, you know, again, the first step, rather than just accepting when counsel uses the term Monster to refer to the marks, trademark infringement analysis is a specific analysis of the registered trademark in comparison with the accused good. In fact, if the court wanted to undertake this exercise, there should be 27 different sleek craft factor analyses with respect to each mark and each product category for the marks and not just kind of an engross, which is not what trademark law is about, analysis of, hey, there's this thing, Monster Energy. Counsel. Yes. Judge Gould, if I could interject a couple of questions. Looking at this from a sort of a big picture angle, I'm wondering how many of the age factors in our test for trademark infringement involve factual issues either extensively or in part? There's certainly plenty of ninth circuit. There's all eight sleek craft factors. They're weighed differently in the context of different cases. There's a trioka that's most important, but there's plenty of case law saying if the marks are completely different, then that's the end of the analysis. But our case law also says that similarity is supposed to be weighed more than any differences. I mean, obviously you have to look at the mark in its entirety, but we've said that you don't weigh similarity and differences the same. You weigh similarity as heavier. You would agree with that, right? That's what our law says. No, I would not agree with that to the extent that evaluating the similarity requires dissection of a registered mark into its component parts, such as if it's a three-word mark, taking one of those words. All right, let me just quote then. Similarities are weighed more heavily than differences. That's iron mark. Are you disputing that or not? I would have to re-review the context of that, but I believe that would come in the context of a forward discussion of the There's always any two things in the universe are similar under some standard. But, you know, the fact that there can be a similarity, the ultimate issue in trademark law in every case is likelihood of confusion. That's why they're pushing so hard on the Hollander survey, because that's their only evidence of confusion. But it's fundamentally flawed. It doesn't pass, you know, the standards of like a first-year survey. Counsel, I have a couple of questions for you. If the question of actual confusion is factual in part or in whole, the question of how much confusion there is, why isn't that the type of question that should go to a jury? You know, there's a lot of discussion and back and forth and development in the Ninth Circuit case law over 30 years about how extents, to what extent is the likelihood of confusion analysis factual. Because if you find it's fully factual, then you don't get summary judgment granted in the worst sorts of trademark cases. And there are many trademark cases in which non-infringement is granted. So, you know, often the analysis, the common sense analysis kind of mixed in with what kind of evidence. Here, the only evidence they have in infringement is fatally flawed, and that's suggestive of the weakness of their case in general. Counsel, I have a related question to my first question. Is there law, any law in the federal courts, either in our circuit or in any other circuit, or in some published district court opinion that says the questions relating to a trademark are quintessentially factual? I think there is language in various decisions. The Federal Circuit, which handles appeals from the PTO and trademark registration and opposition proceedings, there's more trademark law from the Federal Circuit than the Ninth Circuit. So in the hundreds of cases, there are probably some things that say that. But it does take kind of a nuanced understanding. Is the position that you want us to adopt in accord with the Federal Circuit's precedent, or is it different? I think it would be consistent. The position I want the court to adopt is that there's a fatally low bar where, you know, reason and common sense and application of evidence in the record, and the district court goes over the record extensively in its 34-page opinion and analysis. You can reach a low enough threshold where there's no reasonable jury. I mean, the notion of reasonableness is suffused throughout trademark law like other areas of law, and there's a minimum standard of reasonableness that has to be met to survive summary judgment. I have a question. The district court required sales of the sweatshirts and the towels and everything else, but didn't cite any case that requires sales, and the parties haven't cited any cases that require sales. Is it your position that sales are required, or is distribution for free as part of some sponsorship of some event enough? I would say consumers are sophisticated with respect to trademarks, and they understand whether it's goods from Coca-Cola or, you know, J. Cuervo or beer. There are often promotional items associated particularly with alcohol and Monster is a popular mixed drink. It's another thing, and consumers recognize this. They're not going to accidentally receive a bar towel from Monster Energy that says, boldly, Monster Energy, or they would never receive a bar towel from Port Monster because Port Monster sells camping towels. So is that you agree that sales are not required? What's the answer to the question, really? I think I've seen discussion in another circuit on that topic regarding promotional items, but when I say I think I've seen it, I mean like a year ago. I don't remember any sites. What's the answer to my question? I don't think as a matter of law sales are required, but I'm not aware of any explicit precedent. Let me see if my colleagues have any more questions. Judge Gould, any more questions? All right. Thank you. I guess you have a minute 28 for rebuttal. Thank you, Your Honors. I'd like to just briefly touch on a few points. First, just returning to the confusion survey evidence, opposing counsel raised some various arguments about that, but again all of that summary judgment goes to the weight of the evidence. Here there's at minimum a jury issue as to the 64% confusion number and which of those responses we're referring to, to Monster specifically. I'd also point out there's also reference that the survey was merely a reading test, but any survey respondents who identified for Monster, which was the mark shown on the towel, were not counted as confused, so I just wanted to make clear about that. With respect to the other FAME survey, I just wanted to also clarify that that survey was a survey of the general public. It showed the Monster energy word mark in black and white, not in any stylized font. It was not depicted on a can of Monster's drinks. And the results of that survey, the 86% Dr. Isaacson opined, demonstrated that the Monster energy mark at least is famous among the general public, which both supports the strong commercial strength of the mark and also provides evidence that survey respondents who identified Monster were in fact referring to Monster Energy Company. And so if there's no further questions, I'm out of time, and we would request reversal. Counsel, I wonder if you have an answer or a position on the question I asked your friend on the other side of the case. That is the question of to what extent precedent in the federal courts indicates that trademark infringement raises factual issues. Yes, I believe this court has held that the issue of likelihood of confusion, which is what the district court based its opinion on, is a factual determination, and so I would point you to the Thane case that we cited in our briefing, 305F3rd at page 901 for the statement that likelihood of confusion is a factual question. Thank you. All right, if no further questions, we're adjourned for the day. Thank you to all counsel for your very helpful arguments. All rise.
judges: Gilman, GOULD, KOH